**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Robert Douglas Smith,

        Petitioner,

v.

Charles L. Ryan, et al.,

        Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)

No. CV-87-234-TUC-CKJ

DEATH PENALTY CASE

**ORDER**

    This matter is before the Court on remand from the Ninth Circuit Court of Appeals "for the limited purpose of considering Smith's *Atkins* claim." (Doc. 254 at 2.) For the reasons set forth herein, the Court determines that Petitioner is not entitled to habeas relief.

## BACKGROUND

    The lengthy factual and procedural history of this case was set forth in a previous order and will not be repeated here except as relevant to Petitioner's remaining claims. (Doc. 239 at 1-6.)

    After numerous and varied appellate proceedings, the Ninth Circuit suspended Petitioner's federal habeas appeal and directed the state court to determine whether Petitioner's alleged mental retardation rendered him ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304 (2002). *Smith v. Schriro*, No. 96-99025 (9th Cir. Dec. 12, 2005). After extensive discovery and an evidentiary hearing, Pima County Superior Court Judge Jan Kearney ruled in March 2008 that Petitioner had failed to meet his burden of

1    establishing mental retardation under A.R.S. § 13-703.02. The Arizona Court of Appeals

2    affirmed in an unpublished memorandum decision, *Smith v. Kearney*, No. 2CA-SA-2008-

3    0019, 2008 WL 2721155 (Ariz. App. Jul. 11, 2008), and the Arizona Supreme Court

4    summarily denied discretionary review. Thereafter, the Ninth Circuit remanded the matter

5    to this Court for an evidentiary hearing on whether Petitioner had cause and prejudice to

6    overcome the procedural default of a claim alleging ineffective assistance of sentencing

7    counsel. *Smith v. Schriro*, No. 96-99025 (9th Cir. Feb. 26, 2009.) The parties engaged in

8    discovery and filed supplemental briefs. Following a hearing in May 2010, Chief United

9    States District Court Judge John M. Roll found that Petitioner had failed to establish cause.

10   (Doc. 239.)

11       In September 2010, the Ninth Circuit remanded again, this time for the limited

12   purpose of considering Petitioner's *Atkins* claim. *Smith v. Schriro*, No. 96-99025 (9th Cir.

13   Sept. 10, 2010). The matter was reassigned to the undersigned judge in February 2011, and

14   the Court granted Petitioner's motion to amend his habeas petition to add several new claims

15   arising from pursuit of state court relief under *Atkins*. (Doc. 269.) Petitioner filed a

16   supplemental merits brief and Respondents filed a response (docs. 272, 274); Petitioner did

17   not file a reply. Subsequently, the parties filed additional supplemental briefs regarding the

18   effect of *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), and *Maples v. Thomas*, 132 S. Ct. 912

19   (2012), to the cause issue decided by Judge Roll and whether this Court has jurisdiction to

20   reconsider that issue. (Docs. 278, 279.)

21                                    **DISCUSSION**

22       In *Atkins*, the Court held that the Eighth Amendment prohibits the execution of

23   individuals who are "so impaired as to fall within the range of mentally retarded offenders

24   about whom there is a national consensus." 538 U.S. at 317. The Court refrained from

25   mandating specific procedures for determining retardation, instead leaving "to the States the

26   task of developing appropriate ways to enforce the constitutional restriction upon their

27   execution of sentences." *Id.* (quoting *Ford v. Wainwright*, 477 U.S. 399, 405, 416-17 (1986)

28

1    (brackets and internal quotation marks omitted)).

2         In Arizona, a defendant must prove mental retardation to a trial court by clear and

3    convincing evidence. *See* A.R.S. § 13-703.02(G) (West Supp. 2007).[1]  Mental retardation

4    is defined as "a mental deficit that involves significantly subaverage general intellectual

5    functioning, existing concurrently with significant impairment in adaptive behavior, where

6    the onset of the foregoing conditions occurred before the defendant reached the age of

7    eighteen." A.R.S. § 13-703.02(K)(3) (West Supp. 2007). "Significantly subaverage general

8    intellectual functioning" means a full scale intelligence quotient (IQ) of 70 or lower.

9    A.R.S. § 13-703.02(K)(5) (West Supp. 2007).  An IQ test score of 65 or lower establishes

10   a rebuttable presumption of retardation. A.R.S. § 13-703.02(G) (West Supp. 2007); *State v.*

11   *Arellano*, 143 P.3d 1015, 1019 (Ariz. 2006).  "Adaptive behavior" means the effectiveness

12   to which an individual meets the standards of personal independence and social responsibility

13   expected of that person's age and cultural group.  A.R.S. § 13-703.02(K)(1) (West Supp.

14   2007).  To establish mental retardation, a defendant must prove all three elements—the

15   intellectual functioning prong, the adaptive behavior prong, and onset before the age of

16   eighteen. *See State v. Roque*, 141 P.3d 368, 402 (Ariz. 2006).

17   **I.    *Atkins* Proceedings**

18        Following remand from the Ninth Circuit, intellectual functioning testing was

19   conducted by Dr. Sergio Martinez, a psychologist, and Dr. Thomas Thompson, a

20

21        [1]  At the time of Petitioner's state court *Atkins* hearing, the statutory scheme for

22   determining mental retardation was set forth in A.R.S. § 13-703.02.  That statute was

23   transferred and renumbered to § 13-753 in 2009. *See* Ariz. Sess. Laws 2008, Ch. 301, § 26.

      Subsequently, the statute was amended to substitute the term "intellectual disability" for

24   "mental retardation."  *See* Ariz. Sess. Laws 2011, Ch. 89, § 5.  For consistency with

      references to the state court's ruling in this case, the Court will cite to the original statute.

25        It should also be noted that Arizona's statutory scheme provides for mental retardation

26   screening *prior* to trial.  However, for prisoners such as Petitioner who were tried prior to

27   adoption of the statute, the Arizona Supreme Court has directed trial courts to follow the

      procedures established in § 13-703.02 insofar as is practicable for a post-trial case. *State v.*

28   *Grell*, 66 P.3d 1234, 1241 (Ariz. 2003).

neuropsychologist. Dr. Martinez determined that Petitioner had an IQ score of 91 on the Wechsler Adult Intelligence Scale-III and a score of 89 on the Slosson Intelligence Test–Revised, which is within the low-average to average range of intellectual ability. Dr. Thompson, using the Reynolds Intellectual Assessment Scale, determined that Petitioner had an IQ score of 87, which Dr. Martinez adjusted to 93 due to scoring errors later acknowledged by Dr. Thompson. Dr. Albert Johnstone, a psychologist, undertook quantitative electroencephalography (QEEG) testing at Dr. Thompson's suggestion and opined that Petitioner has a lack of connectivity in the left hemisphere of his brain, which may be related to a language disorder, and mild dysfunction of the right frontal lobe region, which may correlate to impulsivity and anxiety.

The state court held a two-day hearing in late 2007, addressing both Petitioner's *Atkins* claim and the State's motion to preclude evidence of the QEEG test results. Four experts testified, and the Court admitted numerous records as well as deposition transcripts of 12 lay witnesses.

QEEG Testing

Dr. Johnstone testified concerning QEEG testing, which involves measuring brain electrical activity from numerous locations on the scalp. He explained that QEEG takes these signals and further analyzes them to detect patterns of frequency. These patterns are then compared, to check for statistically significant deviations, to a commercially-available database of frequencies obtained from a group of individuals who have no symptoms of neurological psychiatric disease and are described as "normal." In rebuttal, the State solicited testimony from Dr. Marc Nuwer, head of the UCLA Medical Center's clinical neurophysiology department. According to Dr. Nuwer, the Academy of Neurology and the American Clinical Neurophysiology Society do not consider QEEG brain mapping to be a useful technique for assessing neurobehavioral or psychological issues and recommend against its use in the courtroom setting. He described interpretation and database problems, noting that QEEG testing flags as statistically abnormal a lot of things in normal individuals

that are not attributable to injury or disease.  In his opinion, neither QEEG nor MRI and CT scans would be reliable tests for determining the presence of mental retardation.  With respect to the QEEG testing in this case specifically, Dr. Nuwer opined that Dr. Johnstone's findings concerning Petitioner's left hemisphere and right frontal lobe lacked clinical significance and did not provide evidence of either mental retardation or brain damage.

Dr. Thomas Thompson

Dr. Thompson testified that there is a high probability Petitioner was retarded at the time of the offense in 1980, but that his functioning improved as a result of a structured prison life and appropriate medication.  He concluded that Petitioner was not retarded as a result of a head injury or genetic disorder, but rather due to a dysfunctional environment and resulting frontal lobe dysfunction.  Dr. Thompson based his conclusion on the following data points:

*Otis Intelligence Scale*

School records appended to the presentence report (PSR) indicate that at age 15, Petitioner twice was administered the Otis Intelligence Scale, scoring 62 and then 71.  Dr. Thompson testified that the Otis test was developed in 1917 as part of intelligence testing created for the Army, had not been normed against various populations, and would not be an appropriate tool for measuring intelligence today.  He also acknowledged that the raw data from Petitioner's Otis testing was not available, and that there was no way of knowing who administered the test, whether appropriate protocols were followed, how Petitioner behaved during the testing, and whether the test was administered individually or as a group, all information that would assist in determining validity of the scores.

*Academic Performance*

School records also document low Stanford Achievement scores and poor grades.  In his report, Dr. Thompson noted that Petitioner's language score on the Stanford ranged from the 2nd to 5th percentiles and his arithmetic score was at the 2nd percentile.  This means, according to Dr. Thompson, that at age 15 Petitioner scored five to seven years below his age

and grade level.  Before dropping out at age 16, Petitioner received primarily D's and F's in his academic courses during his last two years of school.

*Developmental History*

There was no dispute that Petitioner was raised in an extremely dysfunctional family and was subjected to neglect and severe emotional and physical abuse.  Dr. Thompson testified that this chronic stressful environment, combined with poor nutrition, extracted a toll on Petitioner in terms of cognitive functioning and impulse control.  He explained that long-term exposure to stress hormones harms the brain's frontal lobes and leaves an individual susceptible to chronic depressive disorders as well as disorders in the executive functioning of the brain.  In his view, instability is indicative of frontal lobe dysfunction, which is why Petitioner frequently changed jobs and residences and had numerous failed relationships.

Although Dr. Thompson opined that Petitioner would always have lower functioning, he explained that Petitioner improved while in prison because the structure and anti-depression medications provided there act as a "brace" for Petitioner's frontal lobe.  In support, he cited the depositions of Ronald Labrecque, a prison employee who witnessed extensive improvement in Petitioner's work capabilities over time, and Martha Hight, Petitioner's aunt by marriage, who had a mentally-retarded sister with whom she compared Petitioner.  Labrecque said that Petitioner was not good at following written instructions (a likely manifestation of his learning disabilities), but caught on quickly once he was told what to do.  Petitioner was an adult when Hight first met him, but she concluded that he lacked the ability to advance because he was slow and had difficulty communicating in complete sentences.  However, she observed that his communication skills improved after he had been in prison.

*Presentence Report*

In addition to school records, the PSR included various hospital records indicating anxiety attacks and suicidal ideation, much of it stemming from marital problems.  During

one hospitalization in 1970, Petitioner was diagnosed with an antisocial personality disorder. None of the records suggest that Petitioner is mentally retarded.

The PSR also included two handwritten statements from Petitioner. The first, addressed to the trial judge, concerned the offense and surrounding circumstances, claiming Petitioner was unaware co-defendant Joe Lambright intended to kill the victim. The second identified Petitioner's immediate family members and described his upbringing.

In a section titled "Physical and Mental Health," the PSR writer noted that Petitioner's appearance and mannerisms were generally appropriate, although he appeared to be depressed and refused to submit to a presentencing psychological evaluation. With regard to education, the PSR writer wrote that intelligence testing in the eighth grade indicated Petitioner is borderline retarded but educable. Under the heading "Evaluative Summary," the PSR writer described Petitioner as a person with little or no self-esteem, who suffered from bouts of depression and occasional suicidal thoughts. "His borderline mentality probably makes him an easy person to manipulate and somewhat of a follower in social situations. . . . The defendant, more than likely, responds to external, social stimuli on a very concrete level, living basically from day to day and acting on impulse to a great degree." (SCR Vol. 9 at 2466.)[2]  In Dr. Thompson's view, the PSR writer's observations are consistent with frontal lobe dysfunction and mental retardation.

Dr. Sergio Martinez

Dr. Martinez testified that there is a high degree of probability Petitioner was not mentally retarded at the time of the offense. In addition to his testing, Dr. Martinez based his opinion on unreliability of the Otis test scores and evidence of Petitioner's adaptive skills. From his review of records, Dr. Martinez concluded that Petitioner began to lead an independent lifestyle around age 16 and was able to develop some social skills, dating women and working steadily. He also noted that following the offense but before his arrest,

_____

[2] "SCR" refers to the sequentially-paginated state court record provided to this Court by Respondents.

1    Petitioner married and was able to support his wife and her three children.

2         Dr. Martinez also referenced reports from two experts who conducted mental status

3    examinations of Petitioner prior to trial, opining that they corroborated his own intellectual

4    functioning testing.  Both experts found Petitioner competent for trial.  Dr. John LaWall

5    noted that Petitioner was neatly dressed, groomed, and cooperative, but somewhat depressed,

6    with somewhat blunt affect.  He found no evidence of any disturbance in the form or content

7    of Petitioner's thinking.  Dr. LaWall indicated that Petitioner probably functions in the

8    average range of intelligence but suffers from a personality disorder with passive-aggressive

9    and antisocial features.  Dr. Martin Levy observed that Petitioner was neatly dressed and

10   displayed logical, coherent thought.  He noted Petitioner's history of depression and suicide

11   attempts and complaints about memory problems, but stated in his report that "no evidence

12   could be obtained for organic brain syndrome or seizure disorder."  (SCR Vol. 9 at 2426.)

13   In Dr. Martinez's view, these pretrial evaluations contradict the PSR writer's description of

14   Petitioner as being "borderline."  He further noted that probation officers who write PSR

15   reports lack the expertise of psychiatrists and psychologists for assessing intellectual

16   dysfunction.

17        Dr. Martinez additionally testified that intellectual functioning may improve if an

18   individual is given appropriate educational and training programs but that a 30-point increase

19   in IQ is highly unlikely.  Moreover, in his view, prison is not the type of "enriching

20   environment" that would improve intellectual functioning, but rather is a structured, highly

21   supervised environment for which adaptation does not require a lot of intellectual ability.

22        Lay Witnesses

23        Deposition transcripts admitted during the state court hearing provided additional

24   information about Petitioner's upbringing and adult life.  Petitioner's half-sister, Martha Gau,

25   described some of the abuse inflicted on Petitioner and said he suffered a childhood illness

26   that was reported as polio.  Elaine Long, a former neighbor, described Petitioner as socially

27   inept as a child, stating that he did not know how to interact or carry on normal conversation

28

with other children.  In addition to comparing Petitioner to her mentally retarded sister, Martha Hight described Petitioner's stepfather as cruel and physically abusive and his mother as lacking love and compassion.  She also said she and her husband used to buy Petitioner clothes and cigarettes and occasionally cook for him.  Petitioner's sister, Melva Jane Box, reported that Petitioner was held back frequently in elementary school, was enrolled in special education due to his learning disabilities, and was incapable of understanding the rules of simple children's games.  She said their mother believed Petitioner's difficulties stemmed from brain damage caused by polio.  Charles Caperton, a former neighbor, confirmed that Petitioner was in special education classes in school.  Betty Ruth Knight, another neighbor, said that Petitioner always looked lost as a child.

Gerald Lambright, a cousin of Petitioner's co-defendant, described Petitioner as immature, shy, and incapable of thinking for himself.  He said Petitioner would not initiate but instead do whatever Joe Lambright told him to do.  Joe Lambright's wife, Sylvia Scott, similarly described Petitioner as a follower.

Sidney LeBlanc lived and worked with Petitioner in the 1970s.  Similar to the testimony of Ronald Labrecque, LeBlanc said Petitioner had trouble reading and filling out job applications, but could do hands-on mechanical tasks and was not ignorant.  He also said they changed jobs and moved frequently to be "footloose and fancy-free" and would hang out with Joe Lambright and others to party.  He also described Petitioner as a follower and Joe Lambright as the "leader" of their group.  Charles McCarver also lived and worked with Petitioner in the 1970s.  According to McCarver, Petitioner acted normal, went to movies and bars with others, and had good hygiene.

Beth Lewis lived on the same street as Petitioner when they were children and later married him, becoming his fifth wife, shortly before his arrest.  She recalls Petitioner as being withdrawn and standoffish in his youth.  After a chance meeting later in life, they began a relationship, which initially included threats and an alleged attempted rape when she tried to break off the relationship.  Nonetheless, Lewis subsequently married Petitioner, and

1    he became a father-figure to her three children, playing games and teaching them table

2    manners.  She also reported that during their brief marriage Petitioner had a trucking-related

3    job and also performed part-time maintenance work at their apartment complex.

4             State Court Rulings

5             The state trial court issued an extensive 19-page ruling addressing Petitioner's *Atkins*

6    claim.  After summarizing the evidence, the court concluded that Petitioner had failed to meet

7    his burden of showing mental retardation at the time of the offense, under either the

8    applicable clear-and-convincing standard or the lesser preponderance of the evidence:

9    "Although Defendant's dysfunctional family and troubled early life undoubtedly affected his

10   circumstances in an adverse way, and while it is likely Defendant has suffered from clinically

11   cognizable conditions probably including a personality disorder, the circumstances described

12   at the hearing do not point to mental retardation with any degree of certainty."  (SCR at

13   2613.)   The court found insufficient evidence of "significantly subaverage general

14   intellectual functioning" at the time of the offense and no evidence of "significant

15   impairment in adaptive behavior," despite Petitioner's "unorthodox and unstable" pre-arrest

16   life.  "In the absence of adequate information concerning the early Otis IQ tests, and in view

17   of the alternative explanations for his early school and social deficits, Defendant failed to

18   show the onset of mental retardation before the age of 18."  (*Id.* at 2614.)

19            In reaching these conclusions, the court made the following observations:

20       •      Concerning the 1964 Otis tests, which the court found was "outmoded" at the
                time administered to Petitioner, "[t]here is no evidence concerning the
21              qualifications of the persons administering the tests, whether an appropriate
                protocol was followed, the specific circumstances of Defendant at the times of
22              the tests, or any of the other information required to determine the validity of
                these school record entries."  The court also found no evidence to explain how
23              the 1964 test results could be extrapolated to the time of the offense and
                determined they should be given little weight.
24
         •      Lay testimony concerning Petitioner's life in the 1970s showed that "he was
25              a full participant in his adult life" before the offense, having worked as a
                mechanic, truck driver, and cable installer, among other occupations.
26              Although he switched jobs frequently, "he was consistently employed."

27       •      Petitioner had difficulty maintaining relationships with women, but "this fact
                can be explained as arising from his loveless childhood just as well as it can
28

be viewed as an indicator of the limitations of mental retardation." In addition, Petitioner's last marriage "showed promise of being quite different" from his previous relationships, and Petitioner worked and supported his new wife's three children.

- The PSR writer's reference to Petitioner's "borderline mentality" is as likely based on the 1964 Otis IQ score as on an analysis of Petitioner's history and characteristics. In addition, the "experience level of this probation officer is unknown, and there was no indication that he had training as a psychologist or other mental health professional that would provide the expertise required for any diagnostic observations."

- Although they contain spelling and grammatical errors, Petitioner's handwritten statements appended to the PSR were "lengthy, neatly written, logical, detailed, structured and coherent."

(*Id.* at 2602-07.)

        With regard to Dr. Thompson, the court found that his opinion was undermined by three factors: (1) a definition of mental retardation inconsistent with Arizona law; (2) "over-reliance on indicators which, when viewed in context, do not support the weight he places on them;" and (3) a failure to consider other important evidence. (*Id.* at 2610.) The court observed that Dr. Thompson "appears to view mental retardation as a fluid condition responsive to any number of changes in a patient's environment, nutrition, and physical, mental and emotional health" and that he believed Petitioner's low Otis test scores, low grades, lack of social skills, and other deficits to be indicators of mental retardation. (*Id.* at 2610-11.) The court then noted the State's position that these difficulties were caused by Petitioner's dysfunctional background and other mental health problems, not by mental retardation, and concluded that the State's view "is more consistent with the definition of mental retardation provided by Arizona law." (*Id.* at 2611.)

        The court criticized Dr. Thompson's reliance on the 1964 Otis tests, the PSR writer's reference to Petitioner's "borderline functioning," and Petitioner's unstable lifestyle, noting the inadequacies of the early IQ tests and the PSR writer's comments. The court further found unjustified Dr. Thompson's giving more weight to the PSR writer than the two experts who examined Petitioner prior to trial, neither of whom noted any intellectual functioning difficulties. The court observed that although Dr. Thompson attributed Petitioner's unstable

1    lifestyle to mental retardation, he also acknowledged that Petitioner "seemed to have some

2    qualitative independent living skills."  (*Id.* at 2612.)   In addition, Dr. Thompson

3    acknowledged that Petitioner's personality disorder "included features described as

4    'inadequate and immature,' and that this condition included anxiety and depression which

5    could display the impulsivity causing the job changes and relationship issues characterizing

6    Defendant's early adulthood." (*Id.*)  In the court's view, there was an alternative explanation

7    for Petitioner's unstable lifestyle:  "the footloose life espoused by friends and acquaintances,

8    serious academic deficits from causes which may or may not include limitations on his

9    general intellectual functioning, and last but not least, drug and alcohol abuse." (*Id.*)

10        The trial court also ruled that the QEEG testing conducted by Dr. Johnstone failed to

11   meet the *Frye* standard for admissibility because as used in this case it was not generally

12   accepted within the relevant scientific community.  The court further noted QEEG testing is

13   used to show organic brain dysfunction, not to diagnose mental retardation.  Moreover, the

14   court found that the results would have little relevance to the question of Petitioner's mental

15   retardation twenty-five years earlier in light of Dr. Thompson's theory that Petitioner's

16   mental functioning underwent substantial improvement during his incarceration.

17        In its decision affirming the trial court, the Arizona Court of Appeals rejected

18   Petitioner's claim that he had presented sufficient evidence of mental retardation.  It observed

19   that the trial judge "carefully considered all of the evidence presented and exercised her

20   discretion in resolving conflicts in the evidence, in assessing the reliability of the test results

21   and credibility of witnesses, and in weighing the evidence."  *Smith*, 2008 WL 2721155, at

22   *3.  It further found reasonable evidence in the record to support the trial court's factual

23   findings and therefore declined to disturb the conclusion that Petitioner had failed to sustain

24   his burden of establishing mental retardation at the time of the offense.

25   **II.    Newly-Amended Claims**

26        Because Petitioner filed his initial federal habeas petition prior to the effective date

27   of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), pre-AEDPA

28

1   standards govern this Court's consideration of Petitioner's claims, even though they were

2   added through amendment after that date.  *See Sivak v. Hardison*, 658 F.3d 898, 905 (9th Cir.

3   2011) (holding that pre-AEDPA standards apply even if amended petition filed after

4   enactment of AEDPA).

5        Under pre-AEDPA law, this Court reviews *de novo* mixed questions of law and fact,

6   as well as pure questions of law.  *Robinson v. Schriro*, 595 F.3d 1086, 1099 (9th Cir. 2010)

7   (citing *Williams v. Taylor*, 529 U.S. 362, 400 (2000)).  However, "State court factual findings

8   are entitled to a presumption of correctness, subject to eight exceptions enumerated in the

9   previous version of 28 U.S.C. § 2254(d)."[3]  *Id.* at 905-06 (internal quotation marks omitted).

10  This presumption is equally applicable to the state appellate court's findings of fact.  *See,*

11  *e.g.*, *Sumner v. Mata*, 449 U.S. 539, 549 (1981).  Before rejecting a state court's factual

12  determination, a federal habeas court "must conclude that the state court's findings lacked

13

14        [3]  These exceptions are:

15

16        (1) that the merits of the factual dispute were not resolved in the State court
          hearing;

17        (2) that the factfinding procedure employed by the State court was not
          adequate to afford a full and fair hearing;

18
          (3) that the material facts were not adequately developed at the State court
19        hearing;

20        (4) that the State court lacked jurisdiction of the subject matter or over the
          person of the applicant in the State court proceeding;

21        (5) that the applicant was an indigent and the State court, in deprivation of his
22        constitutional right, failed to appoint counsel to represent him in the State court
          proceeding;

23        (6) that the applicant did not receive a full, fair, and adequate hearing in the
          State court proceeding; or

24        (7) that the applicant was otherwise denied due process of law in the State
25        court proceeding;

          (8) or unless . . . the Federal court on a consideration of [the relevant] part of
26        the record as a whole concludes that such factual determination is not fairly
          supported by the record.

27

28  28 U.S.C. § 2254(d) (1994).

                                            - 13 -

even fair support in the record." *Marshall v. Lonberger*, 459 U.S. 422, 432 (1983) (internal quotation marks and alteration omitted); *Mayfield v. Woodford*, 270 F.3d 915, 922 (9th Cir. 2001) (en banc).  Whether a defendant is mentally retarded is a question of fact.  *Walker v. Kelly*, 593 F.3d 319, 323 (4th Cir. 2010); *Clark v. Quarterman*, 457 F.3d 441, 444 (5th Cir. 2006).

### A.   PET Scan Funding

Petitioner asserts that the state court's denial of funding for a Positron Emission Tomography (PET) scan to support his *Atkins* claim violated his right to due process under *Ake v. Oklahoma*, 470 U.S. 68 (1985).

*Background*

Prior to the *Atkins* hearing and at the recommendation of Dr. Thompson, Petitioner obtained from the state court funding for EEG, QEEG, and genetic testing to pursue his mental retardation claim.   After receiving the QEEG results and consulting with Dr. Thompson, Petitioner relayed to the court during a preliminary hearing that his expert had suggested additional imaging.  The court summarily denied the request, stating that "we have gone about as far as we can go down the testing road short of some really extraordinary reason to do it."  (RT 7/13/07 at 29.)

Referring generally to the testimony of Drs. Nuwer, Johnstone, and Thompson, as well as the State's challenge to admissibility of the QEEG test results, Petitioner orally renewed his request for a PET scan at the conclusion of the *Atkins* hearing.  The court again declined, noting that there was no "indication in the testimony that an examination like that is necessary for our purposes today."  (RT 11/1/07 at 177.)  The Arizona Court of Appeals agreed and denied Petitioner's *Ake* claim:

> In *Ake*, the Supreme Court held an indigent criminal defendant is entitled to his own psychiatrist where insanity is a defense.  470 U.S. at 83.  But the defendant is only entitled to funds when reasonably necessary for his defense.  *Id.* at 77.  Smith has not established his due process rights were violated in this context because he has not established a PET scan was reasonably necessary.
>
> Thompson, Smith's own expert, testified that a PET scan was not

- 14 -

necessary to establish Smith had been mentally retarded at the time of the offense because he was confident the results would show Smith had frontal lobe damage. Thompson testified about other indicia that Smith had that condition. And he stated that, if he were simply treating Smith and this case was not "in a legal system, [probably a PET scan] . . . would be overkill." He considered a person's behavioral history more important and equally indicative of whether there existed such damage.

Moreover, Smith has not demonstrated that a more concrete showing that he has suffered from frontal lobe damage could have affected the trial court's ultimate conclusion. The trial court's observation that the test was not "necessary for our purposes today," coupled with its conclusion that Smith was not mentally retarded at the time of the offenses, suggests the court either (1) was satisfied that Smith suffered from frontal lobe damage but did not consider it sufficient evidence of mental retardation, or (2) would not have given the PET scan findings much, if any, credence in light of the other considerable evidence that Smith was not mentally retarded. Notably, any frontal lobe damage currently detectable on a PET scan would have to be considered in light of current intelligence tests showing Smith has near normal intelligence. Thus, while we do not dispute Thompson's testimony that frontal lobe damage can be a cause of mental retardation, Smith has not demonstrated on the facts before us how a current PET scan would be useful in assessing the pivotal question presented in this case—whether his mental functioning was significantly more deficient thirty years ago than today.

*Smith*, 2008 WL 2721155, at *4-5 (alterations in original).

*Analysis*

In *Ake*, the Court held that an indigent defendant must be provided with "a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense" when the defendant demonstrates that "his sanity at the time of the offense is to be a significant factor at trial." 470 U.S. at 83. Petitioner contends that *Ake* requires the State to provide to an indigent defendant "the tools and resources necessary to build an effective defense" and that the inadmissible QEEG testing provided here failed to meet this standard. (Doc. 272 at 9.) Respondents counter that *Ake* does not require funding for a specific type of diagnostic test and to hold otherwise would create a "new rule" barred by *Teague v. Lane*, 489 U.S. 288 (1989).

*Ake* expressly limited its holding to the appointment of *one* psychiatrist and does not guarantee access to a psychiatrist "who will reach only biased or favorable conclusions." *Pawlyk v. Wood*, 248 F.3d 815, 823 (9th Cir. 2001) (quoting *Harris v. Vasquez*, 949 F.2d 1497, 1516-17 (9th Cir. 1990)). "The right of the defendant is to have access to the

- 15 -

1   psychiatrist's opinion, rather than to have access to a favorable opinion." *Id.* at 824.

2   Additionally, the Ninth Circuit has observed that "[d]ue process does not require a state to

3   fund every technologically conceivable test." *Leavitt v. Arave*, 646 F.3d 605, 610 (9th Cir.

4   2011); *see also Vickers v. Stewart*, 144 F.3d 613, 615 (9th Cir. 1998) (noting open question

5   "whether the Constitution requires a State to provide an indigent defendant access to

6   diagnostic testing necessary to prepare an effective defense") (quoting *Vickers v. Arizona*,

7   497 U.S. 1033, 1033 (1990) (Marshall, J., dissenting from denial of certiorari)).

8         Here, Petitioner was provided with his expert of choice—Dr. Thompson, a highly-

9   qualified neuropsychologist.  He also received funding for the EEG, QEEG, and genetic

10   testing originally suggested by Dr. Thompson.  Thus, this is not a case where the petitioner

11   was denied the assistance of a mental health expert or any diagnostic testing.  Assuming that

12   *Ake* requires funding for diagnostic testing, the State's obligation in this regard was satisfied

13   and Petitioner was not entitled to a PET scan simply because results of the QEEG testing,

14   which he requested, were later held inadmissible.

15         Moreover, Petitioner has not demonstrated that a PET scan was necessary to prepare

16   an effective defense.  In neither the state court nor this Court has Petitioner explained how

17   a present-day PET scan would be determinative or relevant to his claim of mental retardation

18   at the time of the offense, especially given the concession that Petitioner's intelligence is

19   currently within a near normal range of functioning.  Further, Dr. Thompson testified that a

20   PET scan would be "overkill" and that he would not recommend one were he seeing

21   Petitioner in a clinical setting.  (RT 11/1/07 at 26-27.)  Because Dr. Thompson already

22   concluded from his own neuropsychological testing that Petitioner suffers from frontal lobe

23   dysfunction, he noted that a PET scan would simply confirm this diagnosis but probably

24   should be done because Petitioner's case was dependent on "who can pile on the most

25   things." (*Id.* at 27.)  This falls far short of establishing necessity under *Ake*.

26       **B.**    **Right to Jury Trial**

27         Petitioner asserts that he was entitled to a jury determination on mental retardation.

28

He acknowledges that the Arizona Supreme Court and other state and federal courts have rejected the argument that mental retardation is an element of the offense which must be proven to a jury pursuant to *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny. *See, e.g.*, *Walker v. True*, 399 F.3d 315, 326 (4th Cir. 2005); *In re Johnson*, 334 F.3d 403, 405 (5th Cir. 2003); *State v. Grell*, 135 P.3d 696, 706 (Ariz. 2006) ("*Grell II*"); *Head v. Hill*, 587 S.E.2d 613, 619 (Ga. 2003); *State v. Lott*, 779 N.E.2d 1011, 1015 (Ohio 2002); *Howell v. State*, 151 S.W.3d 450, 466 (Tenn. 2004).   Therefore, instead of relying on *Apprendi*, Petitioner argues that mental retardation is akin to an affirmative defense and that affirmative defenses are "inextricably bound up in determinations of criminal responsibility and cannot be taken away from the jury."  (Doc. 272 at 11.)

The only support cited by Petitioner is an excerpt from *Grell II*, wherein the court observed that "[p]roof of mental retardation is like proof of an affirmative defense in that it serves to relieve or mitigate a defendant's criminal responsibility, and as with affirmative defenses, the evidence of retardation will lie largely within the possession and control of the defendant."  135 P.3d at 702.  However, the court's analogy to an affirmative defense was made in the context of addressing placement of the burden of proof for retardation on defendants.  In that part of its opinion concerning the right to a jury determination on mental retardation, the court observed that although mental retardation involves factfinding, it "has nothing to do with the acts that make up the crime itself or the defendant's mental state while committing the crime." *Id.* at 706.  Consequently, mental retardation is not the equivalent of an affirmative defense, which necessarily requires factfinding concerning the crime or the defendant's mental state at the time of the offense.  A better analogy for mental retardation is competency for trial or execution, determinations that like mental retardation do not require factfinding concerning the crime or the defendant's mental state *at the time of the offense* and that are routinely determined by judges.  *See, e.g.*, *State v. Lott*, 779 N.E.2d at 1015 ("[A] trial court's ruling on mental retardation should be conducted in a manner comparable to a ruling on competency (i.e., the judge, not the jury, decides the issue).").

1    Additionally, the Supreme Court has continued to emphasize that States bear the

2    responsibility for developing appropriate procedures to determine *Atkins* ineligibility.  In

3    *Bobby v. Bies*, the Court noted that its decision in *Atkins* "did not provide definitive

4    procedural or substantive guides for determining when a person who claims mental

5    retardation will be so impaired as to fall [within *Atkins*' compass]."  556 U.S. 825, 831

6    (2009) (alteration in original).  Rather, the Court explained that it left to the States "the task

7    of developing appropriate ways to enforce the constitutional restriction."  *Id.*  (quoting

8    *Atkins*, 536 U.S. at 317).  Further, in this very case, the Court reversed the Ninth Circuit's

9    order directing the Arizona court to conduct a jury trial to determine whether Petitioner is

10   mentally retarded, noting again that States were at liberty to adopt their own measures for

11   adjudicating mental retardation claims.  *Schriro v. Smith*, 546 U.S. at 7.  Although the Court

12   noted that such measures "might, in their application, be subject to constitutional challenge,"

13   *id.* at 8, Petitioner here fails to proffer any authority suggesting that Arizona's decision to

14   commit the mental retardation decision to a judge, not a jury, violates his constitutional

15   rights.

16          **C.    Mental Retardation**

17          Petitioner does not dispute that the state court's finding as to mental retardation is a

18   determination of fact entitled to a presumption of correctness in this Court.  (*See* Doc. 272

19   at 25 n.4.)  He asserts, however, that he is entitled to *de novo* review under 28 U.S.C. §

20   2254(d) because the denial of a PET scan combined with the lack of a jury trial on mental

21   retardation resulted in (1) an inadequate factfinding procedure by the state court; (2) the

22   failure to adequately develop material facts at the state court *Atkins* hearing; (3) the failure

23   to provide Petitioner a full, fair, and adequate hearing; and (4) a violation of Petitioner's

24   process rights.  *See* 28 U.S.C. § 2254(d)(2), (3), (6) & (7) (1994).

25          The Court has already addressed Petitioner's PET scan and jury determination claims

26   and found that each lacks merit.  Accordingly, neither of these alleged deprivations provides

27   a basis for satisfying the exceptions in the previous version of § 2254(d) for overcoming the

28

- 18 -

1   presumption of correctness.  The state court provided a lengthy period of time for Petitioner

2   to prepare for the *Atkins* hearing and authorized Petitioner's expert of choice, his initial

3   diagnostic testing requests, investigative resources, and numerous depositions of lay

4   witnesses.   Other than the lack of a PET scan and jury determination on the mental

5   retardation issue, Petitioner identifies nothing to support a finding that the state court's

6   factfinding procedures were inadequate, that material facts were left undeveloped, that the

7   state court failed to provide a full and fair hearing, or that his due process rights were

8   violated.   Therefore, the Court finds that Petitioner has not overcome the presumption of

9   correctness on any of these grounds.

10   Petitioner also asserts summarily that the state court's determination is not fairly

11   supported by the record.  *See* 28 U.S.C. § 2254(d)(8).  He does not identify deficiencies in

12   the state court's ruling, but instead contends that his proffered evidence "overwhelmingly"

13   established the subaverage intellectual functioning and adaptive skills prongs of Arizona's

14   mental retardation test as of the time of the offense in 1980.  The Court has reviewed the

15   entirety of the record provided by the parties and concludes otherwise.

16   First, Petitioner does not dispute that the 1964 Otis tests are unreliable.  The record

17   is devoid of any evidence concerning the testing, including the raw test data, identification

18   of the administrators and their qualifications, or the protocols followed.  In addition, Drs.

19   Thompson and Martinez both testified that the Otis test would not be used today to determine

20   an individual's IQ and was outdated at the time it was administered to Petitioner in 1964.

21   Therefore, the record fairly supports the state court's conclusion that this evidence should be

22   given "little weight."

23   Second, as noted by the state court, the evidence presented at the hearing indicated it

24   is just as likely that Petitioner's poor school performance and unstable lifestyle was the result

25   of a severely dysfunctional upbringing and personality disorder as it was mental retardation.

26   Petitioner led a transient lifestyle, frequently changing employment and residences, but many

27   of his jobs (such as being a mechanic, a cable installer, and a truck driver) required at least

28

a minimal degree of intellectual functioning.  Although witnesses agreed that Petitioner is not "book smart," he learns quickly when shown how to do something.  In addition, the record supports a finding that Petitioner began living an independent life after dropping out of school at age 16 and was not dependent on others to function in his daily life.

There is ample evidence in the record to support the state court's conclusion that Petitioner failed to establish either "subaverage general intellectual functioning" or "significant impairment in adaptive behavior" before the age of 18 as set forth in A.R.S. § 13-703.02.  Consequently, Petitioner has not overcome the presumption of correctness attached to the state court's finding that he was not mentally retarded, as defined under Arizona law, at the time of the offense.

**IV.    Cause for Procedural Default of IAC Claim**

Following the Supreme Court's decisions in *Maples v. Thomas* and *Martinez v. Ryan*, the Court directed the parties to file simultaneous supplemental briefs on the effect, if any, of these cases on the issue of whether Petitioner has cause to overcome the procedural default of his sentencing IAC claim and whether this Court has jurisdiction to revisit the issue.  The parties agree that this Court lacks jurisdiction given the expressly limited wording of the Ninth Circuit's remand order.  (Doc. 278 at 2; Doc. 279 at 2.)  Therefore, the Court will not address the parties conflicting views on applicability of these cases to Petitioner's cause argument.  *See United States v. Davis*, 519 F.3d 926, 927 (9th Cir. 2008); *United States v. Stump*, 914 F.2d 170, 172 (9th Cir. 1990).

**VI.    Certificate of Appealability**

In *Slack v. McDaniel*, 529 U.S. 473, 482 (2000), the Supreme Court held that the right to appeal from a denial of the writ of habeas corpus is governed by AEDPA's certificate of appealability (COA) requirements, not the previous certificate of probable cause (CPC), if the notice of appeal is filed after April 24, 1996, AEDPA's effective date.  In this case, Petitioner's first notice of appeal was filed on November 1, 1996.  Therefore, the Court must determine whether to issue a COA on any of the issues presented by this limited remand.  *See*

1   *Lambright v. Stewart*, 220 F.3d 1022, 1024 (9th Cir. 2000) (finding that Petitioner and his

2   co-defendant needed COA rather than CPC to proceed with appeal).

3         Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district judge

4   must either issue or deny a certificate of appealability when it enters a final order adverse to

5   the applicant.  If a certificate is issued, the court must state the specific issue or issues that

6   satisfy 28 U.S.C. § 2253(c)(2).  Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only

7   when the petitioner "has made a substantial showing of the denial of a constitutional right."

8   This showing can be established by demonstrating that "reasonable jurists could debate

9   whether (or, for that matter, agree that) the petition should have been resolved in a different

10   manner" or that the issues were "adequate to deserve encouragement to proceed further."

11   *Slack*, 529 U.S. at 484 (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

12         The Court finds that reasonable jurists could not debate its resolution of Petitioner's

13   *Atkins*-related claims.  The question of whether the state court erred in finding that Petitioner

14   was not mentally retarded under Arizona law is not debatable among jurists of reason.

15   Similarly, there are no debatable facts or legal authority to support either the *Ake* claim or

16   the claimed right to a jury determination on mental retardation.  According, the Court

17   declines to issue a COA.

18         Based on the foregoing,

19         **IT IS HEREBY ORDERED** that Petitioner's *Atkins*-related claims are without merit.

20   Therefore, Petitioner's Amendments to Petition for Habeas Corpus (Doc. 258) are denied.

21   The Clerk of Court shall enter judgment accordingly.

22         **IT IS FURTHER ORDERED** denying a certificate of appealability on Petitioner's

23   *Atkins*-related claims.

24         DATED this 29th day of November, 2012.

25

26

27                         Cindy K. Jorgenson

                         United States District Judge

28